Good morning, Randall Quinn for the SEC. I'd like to reserve five minutes for rebuttal. This is a financial fraud case against three former top officials of Gateway Computers, which was a public company at the time of the violations. The Commission is seeking reversal of two orders by the District Court. After jury verdict in the Commission's favor, the District Court entered judgment as a matter of law for Todd, who was the chief financial officer, and Manza, who was the controller. Prior to trial, the District Court had granted summary judgment to Whiteson, who was Gateway's president and CEO. I'd like to focus my argument today on two points. First, the JMOL for Todd and Manza should be reversed because substantial evidence supported the jury verdicts. The District Court improperly substituted its view of the evidence for the jury's view of the evidence. And second, the summary judgment for Whiteson should be reversed because the District Court did not apply the correct legal standards. Under correct standards, Whiteson is not entitled to summary judgment. I'd like to begin with the JMOL for Todd and Manza. In this case, the Commission alleged that Todd and Manza misrepresented Gateway's financial condition by fraudulently inflating revenue. The Commission presented its evidence at trial that supported liability. Counsel, I wonder if I could interrupt you just for a moment. Yes, sir. I must say, I follow the Commission's perspective on the Lockheed matter and the VERISERV, or BENSERV, excuse me. BENSERV, yes. But as to ACS, and there's so many entities in this thing, and the high-risk lending, I have some real problems with that one. In the connection with ACS, I'm finding difficulty with CYENTR. I don't know where you find that, and perhaps to some degree the materiality issue because you're talking about one cent of earnings difference in that particular case. And on the high-risk lending, and by the way, on the Todd, I mean on ACS, it really is the Todd only. ACS is Todd only. Right. On the high-risk lending, it's the Todd on the second quarter, and the third quarter, Todd and MANSA. I'm also having some problem with CYENTR. Can you help me on both those points? Mr. Justice, I will. One, if I can make one preparatory comment, which is that in order to preserve this verdict, we only need to prevail on one of the three questions. And I appreciate that. I will now answer your question. I understand. It was in the disjunctive, right? Yes. Okay. Again, we're just trying to get all of the pieces here. We've got a lot of moving parts and a lot of fine lawyers. The case doesn't suffer from being too small. No. As for ACS, the big picture about ACS is basically there was a sale and there was a loan to a subsidiary of parents. Right. So a sale and a loan to related companies. Right. And the testimony of trial supporting the commission was that it's misleading to book revenue on the sale because the sale and the loan are interconnected. And if they're interconnected under the accounting principles, then there should be various adjustments and you shouldn't book revenue. But in this case, as I understand it, PricewaterhouseCoopers was aware on ACS, was aware of both the loan and the sale. Is that correct? Yes. They were not aware that they were interconnected. The key thing that supports our view that there's a misrepresentation is that the sale and the loan are interconnected. And the defendant's evidence was, you know, that he received. I guess it's kind of the combination here. You got less than one cent of earnings per share in this time period. PricewaterhouseCoopers seems to be aware of the existence of this. And they, of course, are the auditors. So as to that, as to ACS, can you see why I'm struggling with the substantial evidence? Let me try to answer. There are two separate things. Just the risk of repeating myself on the misrepresentation. Our position is what PWC was not aware of was that these were interconnected. It's the interconnectedness of selling something and, in effect, simultaneously loaning a related party money that causes the accounting problem. As to materiality. Now, you're saying that because the record shows that? The record does show that. The record does show that. The record does show that. There's evidence that supports our view of what happened. Materiality. Our position is there should not be a numerical bright line here on materiality. The one cent a share was the difference between meeting the forecast of securities analysts that followed the company and exceeding it. And the company, and Todd in particular, touted this in a press release. They made public statements. Look, we beat this consensus estimate by one penny. So that certainly should go to a jury on materiality. In other words, our view is that the jury. In other words, we have to tie it. Because the objective all along, according to the SEC's complaint, was that they had to meet the estimates. The market was awaiting the news, and so they had to meet it. And the fact that it was only one penny doesn't matter if you couple it with the fact that that was the objective all along, is to meet that target. The penny is the difference between meeting it and exceeding it. And again, our position, because this is a significant legal issue beyond this case, is that there should not be a numerical bright line here on materiality. What makes it material is the fact of exceeding more than the amount. As I say, that is the combination. Also, I think the fact that they, Judge Rowe, the fact that they touted it. The question is, what would an investor consider important? And if the company says, look, we beat this by a penny, I certainly think a jury can consider, well, the company itself thinks it's important that they beat the consensus by one penny. But that's different, is it not, from the more egregious case where they miss the earnings forecast. I mean, that usually triggers a landslide of shareholder derivative actions and class actions. Here, the analysts predicted, what was it, 36 cents? The prediction, I believe, was 36, and it came in at 37. Came in at 37. So I'm having a hard time understanding from a materiality standpoint. Okay, they did better than the analysts predicted that they would do, but that's not as significant as missing it by a much lower figure. Do you understand my concern? I would respond, even if it's not as significant, it's still something that an investor might consider important. If you step back and look at, in the second quarter, what was going on, the company is presenting itself as a company that's not only doing better than predicted, that it's doing better than its competitors. I don't see why a jury couldn't conclude that. The problem I'm having is that an earnings per share forecast is a forecast, and the company can't know until the actual end of the fiscal quarter whether it actually met that forecast or not. Your theory is that they, in essence, manufactured sales in order to exceed the forecast. Am I correct? Well, I wouldn't... In essence, through accounting maneuvers, they inflated their sales figures in an improper way. Yeah, they improperly recognized revenue. That should not have been recognized as revenue. Yes, yes. What would the SEC say about the California budget? Well... Maybe that's a subject for another day. Perhaps I'll defer to the political branch on that. But back to the materiality point, if I could possibly pull this back to sort of larger principles, would a reasonable investor consider important not simply that you met what the prediction was, but that you exceeded it? And there is evidence here. The company is tracking this, so they know what the forecast is, they know how they're doing, and so on. Well, what's the misrepresentation? We're back to ACS to keep the transaction straight. The misrepresentation is there is a sale and there is an interconnected loan. And they recognized revenue just from the sale. I believe it was $4.3 million. And what the commission's experts testified was because these transactions are interrelated, you wouldn't have had the sale without the loan was our testimony. Then under the accounting principles, you shouldn't recognize basically the total revenue from the sale. So that's the misrepresentation part. That's different, of course, from the materiality part. So if I could put it in very simple terms, it would be they made it look like a sale, but what they really did was they advanced the money that was then returned to them as a result of this interconnection. And so it really wasn't a sale after all. I don't think we need to go that far. That's suggesting the whole thing is a sham. I think we only need to go as far as when the transactions are interrelated, I would step back and say you wouldn't have done the sale if not for the loan. Or the other side of the transaction wouldn't have bought without for the loan. That's as far as we need to go. We don't need to show that there was no substance at all to it. They manufactured a phony sale. Correct. Mr. Quinn, I want to go to the second part of what I asked about, which is the high-risk lending. Yes. As I understand it on the second quarter, and this applies to Todd only according to my notes, Todd's knowledge that the program entailed risk, I guess, where's the scienter in that, the fact that he knows that it entails risk? Maybe a non-business move, but is it scienter? We're in the second quarter, and what's happening is they're recognizing revenue from these risky transactions, we say, and there's no disclosure at all in the second quarter. Right. There's no evidence of consulting the auditors, and I think the scienter... Well, there actually is in the third quarter. Yes, yes, I'm trying to... I understand, okay. I'm on the second now. Okay, right. On the second quarter, it's Todd only, and I think the scienter is, you know that the company is engaging in these transactions. You know that the revenue that you're reporting depends in some significant way on these transactions. But it's making a loan to higher-risk buyers, basically. Yes. So, I mean, the fact is there are lots of businesses that say, for example, sell used cars to people for very high rates of interest, very high-risk loans, but they know that. They know that. And in this case, again, one can question the business aspect of it, but it's one thing to create an artificial structure, which is what we've got over on the other side, but here, just the high-risk alone, why is that scienter? Well, Judge, with that, I would... I think when I look at this is we don't need to question the business aspect of this. Our position would be... No, I understand that, yeah. If you ought to engage in these high-risk transactions, and I should clarify, this is not... The high-risk transaction is not a question of the accounting. It's a question of the disclosure. Disclosure, right. And, again, maybe you simply don't find my answer persuasive. If you know, you know the company is engaging in risky transactions that make up a significant part of the revenue that you're reporting, and you don't disclose that. The disclosure we would want to... So from your perspective, we shouldn't be looking at the high-risk lending in isolation. We should look at it as part of the total fraud from the SEC's perspective. Is that a fair statement? That is fair. I do think it's important in this case to step back and consider what the commission's case is, which, as I tried to start off with, the senior officials of the company misrepresenting its financial condition based on a number of transactions. I will repeat myself. We only need to preserve the verdict based on one. Right. And that's important. But let me just finish with the final one here. The third quarter involving both Todd and Manza, as I understand it, they knew and they agreed that disclosure was necessary. They consulted with PricewaterhouseCoopers. They approved of the statement, even though it was abbreviated. What's the problem there? The problem there is that they asked the auditors, what should we do? The auditors said, you should do X, Y, and Z. And they said, we don't really want it. We're just going to do X. The auditor says, well, okay, you can do X. Our position is that the jury was instructed, you can consider their reliance on auditors in determining scientia. And, of course, scientia encompasses recklessness. Right. So just to sum up, our position would be, the question for the jury is, is it reckless to go forward? Even though the auditors grudgingly agreed, is it reckless to go forward anyway? I would submit that that is a jury question. Because discussions like that occur all the time with public companies. All the time you have these discussions with the auditors and the CFOs and sometimes the CEOs after Sarbanes-Oxley and so on. They push each other back and forth. That's part of the deal. At least as to this element, I'm struggling to see why, as to the third quarter, that's not exactly what happened here. Well, Judge Smith, perhaps if all you had in the case was the third quarter, then it might be a different case. I'm not sure we have to look at it. I think it's very important to the big picture. Okay. Can I briefly turn to summary judgment or are there follow-ups? No, go ahead. Summary judgment. The legal error, I want to focus on the legal errors in respect to control person, control person liability. And, first, the district court held that for control person liability, there needs to be control of specific transactions. That is a clear legal error. The test is control of the company. You see that from the plain language of the statute, Section 20A. You see that from this circuit's cases and in Howard and Paracore. If you apply the correct standard, control of the company, we have evidence that, for example, Wysen was president and CEO. The company bylaws said that he had control of management of the company and there's other evidence there. I don't think I need to recount it unless there's questions. So there's a control person status, a clear legal error. Is the CEO by definition a control person according to the SEC? Not always. It's certainly, as the cases talk about, it's a red light. It's a strong indication. So it isn't what the bylaws say or what the corporation's code says. It's what actually happens. Do you have control of the company? And there could be an example, I think, the Paracore case that they rely on. That was a case where the CEO was excluded in Paracore from having any role in certain transactions. If a company is set up that way, then certainly it's possible. Here I think it's crystal clear that on these facts, Wysen meets the correct test for control of personal liability. And, John, there's one other legal error that was made. The control person statute allows a defense and the burden is on the defendant in that point. If the control person can show that he acted in good faith and did not directly or indirectly induce the violation, that's a defense. That's in the statute. The district court held Wysen acted in good faith, therefore met the defense. This course has held those are two independent requirements. Act in good faith and not directly or indirectly induce the violation. The district court didn't address the induced prong. And as we've argued in our brief, induced has been interpreted to include authorizing. Wysen authorized a press release that contained misleading statements. So, again, those are two legal errors on control person that we feel warrant reversal. We'll give you a little time, I guess, if it's necessary on the cross appeal. Okay. There are no other questions. I don't appear to be in. We'll give you a couple extra minutes if you need it. Good morning. My name is Jim Sanders. I represent Robert Manza. I'm going to speak first and then counsel for Mr. Todd and Mr. Wysen are also going to talk. And we've split our time. Let me go to Lockheed. Six minutes apiece. Okay. You have to help keep track. Thank you. Can you tell me again who you represent? Bob Manza. Manza. I'm going to go to Denserve and Lockheed, but I want to deal briefly with the high risk lending issue that was brought up in the questioning. You know, they had a disagreement with their auditors about what to put into the disclosure in the third quarter about high risk lending. They went ahead and put a disclosure in. I want to just bring the court's attention to one thing. When the restatement was done months later, they used the identical disclosure in the restatement. In other words, this wasn't a case where there's any substantial evidence that the auditors bent to the will of the insiders. The auditors used exactly the same disclosure language six months later when they did the restatement of the third quarter. There's no evidence that anybody acted with scienter and deliberately did anything wrong with respect to that. Do you agree with the SEC that in this particular case, all we need to find is substantial evidence supporting the jury verdict for one of the four transactions? I think that's the way the jury instruction was written. Okay. Since we asked them about their weakest part of the case, let's go to your weakest part of the case. I'm happy to go to either of the last two. Take either one that you want. Let me deal with Venserve first because I think the sequencing is going to take it in. Work it any way you want. In the third quarter, the Venserve transaction takes place. That's a $20 million transaction, a sale to Venserve, a real company that ultimately pays Gateway $30 to $40 million for computers that it purchases as a part of reseller agreements. So this is not a sham transaction. This is a real transaction. Venserve is a company that's funded by Warburg Pincus, an investment banking firm. So just to eliminate the sham transaction aspect. In the fourth quarter, after the third quarter revenues are booked on that transaction, the existence of the referral agreement comes to Bob Manz's attention. It comes to his attention in January of the very next year. He's asked some questions by PWC. He looks for an answer to those questions. He finds the referral agreement. He discusses it with PWC, and they realize they've got to restate the Venserve transaction because revenue could not have been appropriately booked in the third quarter. So that's the scenario from a sequencing event. What's in the referral agreement? And it shows that there's a continuing obligation by Gateway to refer customers and to make employees available to Venserve. And if they don't do that, the $20 million doesn't have to be paid. So that's the contingent nature of it. That comes to light in the fourth quarter. What's the allegation here? That Bob Manz knew that in the third quarter, and there's no substantial evidence of that. Let me just ask you this. Again, I have to rely on notes because there's so much traction. My notes indicate that Manza conducted an investigation in October, learned that Gateway had leased an employee to Venserve to sell computers. He discovered that Venserve's computer inventory was invaded, which he brought to Todd's attention, and knew that the computer still had to be shipped back to Gateway for warranty registration, which all of which suggests that the sale was incomplete. Let me deal with each of those in kind. Okay. First, the leasing of the employee. What he testified and what the evidence shows, what he learned about the leasing of an employee, he did not learn that the sale was in any way contingent on the leasing of that employee. And that's a key difference. He learns that three months later. Where in the record can I find that, if you know? I know you won't get it, but it's in his testimony. It testifies that he learns about the leasing of an employee, and there's a world of difference between knowing that there's some guy on the loading dock who you're going to use to load computers onto the truck, and some guy whose employment makes the sale a non-existent sale. And he doesn't know that, and there's no evidence that shows he knows that. With respect to the inventory invasion, the true reasonable inference from the inventory invasion is that they think this is a real sale. Somebody takes the inventory that they sold to Venserve and gives it to a company called Rentway, and there's an explosion at Gateway over that, because they've taken inventory that they've sold and used it for another customer. That doesn't support any reasonable inference that they know that that's not a real sale. It's exactly the opposite. And I've forgotten the third one. This was the issue that he knew that the computers still had to be shipped back to Gateway for warranty registration. So they have two of these reseller agreements at the same time. One is for Rentway. One is for Venserve. It comes to the attention of people in the warehouse that Rentway computers are being shipped back in for warranty registration. They do an investigation with lawyers, ethics people, to see if that impacts revenue recognition, and they reach a conclusion that it does not. They fully vet that issue, and that certainly cannot support any inference that there's some scienter where they ignored the revenue recognition issue. So at the end of the third quarter, they've investigated the invasion. They've investigated the warranty registration issue, which I might note involved Rentways more than Venserve and never resulted in a restatement of the Rentways transaction because it doesn't impact revenue. And he knows about the one employee, but he doesn't know there's a continuing obligation. I submit that that's not substantial evidence taking all reasonable inferences in the favor of the SEC. Did the district court consider this as part of its decision? I think it did. Okay. Let me go briefly to Gateway. Gateway is a transaction involving $47 million. The theory of the case was that you can never sell fixed assets and book the fixed asset sale as revenue. That was the theory the case was brought under. That was the theory that the SEC's experts testified to. He also testified that all GAAP, because if this doesn't violate GAAP, it's not a violation. All GAAP is in writing. There's no evidence at all in this record of any GAAP violation with respect to that. He testified at his deposition that he couldn't find any written evidence of GAAP. He testified a year later at the trial he couldn't find any written evidence of GAAP. And he testified that CON 6, the accounting principle that we brought to their attention, was the appropriate accounting principle. And that accounting principle is in the record. You're free to read it. I invite you to do it. On ER 79 and 161, my notes indicate that Todd directed your client not to tell PricewaterhouseCoopers about the revenue recording on Lockheed because there was concerns that the, in quotes, auditors wouldn't go for it, in quotes. What's your response to that? My response to that is twofold. Number one, you never get to the scienter issue if the accounting is correct. All right? In other words, if you think it's wrong and it's not wrong, it's like the tree that falls in the forest and nobody hears it, right? If it falls within GAAP, which it does here because it's part of the major and ongoing operations of the company, and CON 6 specifically provides that revenues for one entity may be different from revenues for another entity, and there's no evidence at all from the SEC of any GAAP provision that says they could not do it this way. I'm interested in that. I'm sorry, go ahead. I was just going to say you're into your code. And he's already handed me the orange piece of paper and the bell. Let me just think about this for any further response here. Do you have any case law that indicates what you just said, at least as I interpreted it, which is that if something is actually permissible under GAAP, but a person thinks it's illegal and thinks it's a breach of the securities laws, does that constitute scienter? It sort of goes back to the subject. I didn't do that well in law school, Your Honor, dealing with the legal impossibility under the criminal statutes. We invite you to consider that possibility. Thank you. Good morning, Your Honor. Bob Gross on behalf of appellee and cross-appellant John Todd. I have two goals in the short time I have. One is to address your questions. The other one is not let the item that slipped to the bottom of the list stay there, and that is the motion with respect to the findings for the new trial. But specifically with respect to your questions, one point to note, I believe, to yours, Judge Smith, was about the lease arrangement, which was in the record. It was to be a short time period that the employees were to be released. This has been through the trial and actually through the appeal, much like the whole is somehow greater than the parts. And when you put the parts together, and maybe this goes to the question about some sort of overall overarching scienter, is that it doesn't hold up when you examine each of these transactions. This was clearly a case that alleged accounting fraud. So the issue, for example, about whether there was a sham transaction with ACS, no one contended any such thing. This was strictly about how the accounting was to be done. And it's logical that I should follow counsel for Mr. Manza. Well, is it that? I understood their theory to be a little different, and that was that if the motive for the fraud is to misrepresent the financial condition of the company, that's the fraud on the market. The fact that it is done, the modus operandi, is through accounting manipulation, is simply the means by which the artifice or scheme to the fraud is carried out. Isn't that the SEC's theory? It is, but of course that happens transaction by transaction and quarter by quarter. But to get back to what Judge Smith was talking with Mr. Sanders about, I'm not sure that it makes a huge difference whether there's a specific gap provision that addresses the specific transaction. If the corporate officer acts with ill motive, and it's part and parcel of the scheme to misrepresent the financial condition of the company, hasn't the commission made out an SEC violation? Well, let me hypothesize that John Todd, who was the CFO, a non-accountant, non-lawyer, is relying upon accountants and lawyers, even though he has, hypothetically, a state of mind. That's an offense to whether or not he formed the scienter, the intent to engage in these transactions with fraudulent or intent to mislead. My hypothesis is that he has a state of mind that he wants to do something that's improper. But he has to be carried out through the people who are his subordinates, and they're not carrying out anything, whether they know of his state of mind or don't know of that state of mind. What they are doing is appropriate according to Gap. What about the comment that, I don't know if you remember what I asked your colleague about, where allegedly your client said to his client, don't tell PwC about this because they're not going to like that. In essence, there's a problem with it. Any comment on that? I had wondered, not knowing specifically the reference or having it. I'll find it for you. There was one that sounded like that to which there was an objection. It's in our brief, because it was a hearsay statement two years after the fact between an outside auditor and Mr. Manzo. It was ER 79 and 167, according to my notes. And again, I'm not sure. No, I'd say you have it in front of you, but that's the question I have. There was testimony about the curiosity of John Todd as to what needed to be done, what needed to be disclosed. In fact, the SEC has attributed to him scienter because he asked a very simple question of one of his accountants one time, which was, do we have to disclose loan losses? Simply that. And that was deemed to infer scienter. But here, and again, I don't know whether he said it or not, but at least according to my notes, he expressed concern that, in quotes, the auditors wouldn't go for it. Now, that doesn't sound so much like a question. It sounds like a statement that the jury could take as scienter, an underlying belief on his part that this was improper. If I'm correct, and I'm not sure exactly, Jim Smith, is that there was a debate going on about how the Lockheed transaction should be booked. And Mr. Manza was at first hesitant or reluctant about how that should be booked, and then others talked to him about a previous experience that the company had had with it was selling product out of its stores, which had been booked then as revenue, and he came around to the belief, after doing research on the subject, that he accepted that. But the government brought in a string of lower-level accounting witnesses from the company's internal accounting department who all testified that they wouldn't have booked it that way, which tends to suggest that not only is it a very unusual revenue recognition transaction, but it struck a whole bunch of people who worked in the company at the time that it was wrong. And the fact that he went and got consolation from what the SEC characterized as a partial disclosure doesn't necessarily give him cover, does it? You're quite correct, Judge Tom. There was testimony with respect to the debate that was going on within the company about that. And the conclusion that was reached by Mr. Manza, which I think is very clear in the record, was, yes, I think it is appropriate. GAAP allows a company to pick alternate treatments. That's the one they picked. And then it was very clearly in the evidence shown to the PWC outside auditors with a specific request, this is significant, you should look at it. Which of the four transactions – this may be an unfair question, but I want your input – which of the four transactions that are the subject of this substantial evidence question do you think is the weakest from your client's perspective? Honestly, I would say the Lockheed transaction, only because it's so unusual. It was not something the company had done before to take all of its equipment and sell it to the provider of the services and all that. It went through debate. Would you agree, going back to that time period, that this was a fairly common practice by companies in distress in this business? To sell office equipment? Basically to kind of goose up the books a little bit by being involved in these very kinds of transactions. I think from my knowledge of this is that Gateway was a company that was growing and was doing a lot of new businesses. And in the course of that, they clearly wanted to succeed. But they were also very smart people, and they looked for ways in which they could make that company a power in the agency. You're into your time. I'll try and do it within a minute, if the Court would permit. And that is with respect to the cross-appeal, which did not get a lot of treatment in the response from the SEC. There's two parts to it, actually. One of them is with respect to all of the counts, and that is per Rule 50C, once the Court had granted the JMOL, it is a requirement to make a conditional finding whether you're going to grant or reject a new trial. If the case were to be remanded, I think that that issue needs to be addressed. The second portion of this, though, is with respect to the Section 13 counts only, and I think that is a debate that perhaps will be addressed further by Counselor for Mr. Weitzen because it figures in his charges, too. But in a nutshell, it is the standard by which one is to regard an entry in a book made by another and what state of mind should accompany it. There was a debate over whether it should be some form of knowledge of unreasonableness. It's not scienter, and yet this instruction that was given sounds very much like strict liability, and I think that is well beneath what it should be. Thank you, Your Honor. Thank you. May it please the Court, I'm Clifford Sloan for Appellant Jeffrey Weitzen, the former CEO of Gateway, and as Your Honors know, the appeal with regard to Mr. Weitzen, it stands in a very different procedural context and in many respects a very different factual context. And I want to get right to the opposing counsel's comments on control person liability. Before I do, I just want to mention that in addition to multiple independent legal problems with each of the three counts against Mr. Weitzen, there is a common flaw that runs through all three of them as the district court found, and that is that Mr. Weitzen acted at all times with good faith. There's no genuine issue of material fact about that, and that has major implications for each of the three counts. But why wasn't it a jury question with regard to his involvement in the analyst telephone conferences and the preparation of the press release on the market for the jury to decide whether or not there was scene? Your Honor, two reasons. Okay, the first and most fundamental reason is that the SEC radically changed its theory. This relates to the 10 v. 5 count, which relates only to the Lockheed and the AOL transactions. And at summary judgment, it is very clear on the record that the SEC, in its briefs and in its argument to the district court, rested its fraud allegation on the idea that there was something improper about the AOL transaction and the Lockheed transaction. If you look at their summary judgment brief, repeatedly it says a sham transaction, fraudulent, fictitious, improper. Never asks the district court to rule that even if these are totally proper, the failure to call them out, even while giving completely accurate numbers, was somehow fraudulent. Let me ask you this. I appreciate your enthusiastic representation of your client. According to my notes, there is evidence in the record that suggests that Mr. Whiteson knew that both the Lockheed and the AOL transactions were one-time events that were designed to meet quarterly revenue targets. And I cite you to the records of record 462 to 63 and 510. What's your response to that? Well, I have a couple of responses to that. First of all, again, because the SEC radically changed its theory, those issues were not fleshed out. That was not how it was presented to the district court. But regardless of that point, Your Honor, going right to the SEC's newly minted theory, as it says at page 55, note 10 of its brief, that even if perfectly proper, there was fraud for not calling these out. Necessary linchpins of the SEC's arguments are that there was something distinctive about these transactions in being nonrecurring on the one hand and that they were necessarily nonrecurring on the other. And the record does not carry the weight that the SEC needs for it to carry with regard to both of those propositions. In terms of being distinctively nonrecurring, the sale of a personal computer is a nonrecurring event. And in the conference call, the very conference call that the SEC points to— But with respect, this is a company that makes hundreds of thousands of computers. This is what they do. This is their business. It's not like you and I exchanging a computer. I'm not sure that what you're suggesting in terms of that carries a lot of weight. This is a public company. Your client has to sign documents. It's aware that these disclosures are important to purchasers and sellers of securities. And according to what I read, the record shows that he was aware that these were one-time charges for the specific purpose of goosing up the quarterly revenue. Okay. Your Honor, respectfully, I disagree with that characterization. And the goosing up— Let me say— I will amend the goosing up. No, no, no, no, no. No, but—and this is a very important—this is a very, very important point, Your Honor, because the suggestion that the Lockheed transaction and the AOL transactions were basically contrived to inflate the revenues could not be more mistaken. And again, the SEC now says, as it comes to this Court, assume those are perfectly proper transactions. But let me say a couple things about the context of both of those transactions, which are in the record and which are important. The AOL transaction, okay, changing it from registration to shipment, resolved a very deep and bitter dispute between AOL and Gateway about how to count the subscribers. This is in the district court's opinion. The district court says quite explicitly, this resolved the longstanding dispute. This was an ongoing source of friction for them. They said, you know what? Let's just do it as shipment rather than as registration. So it had that independent purpose. There's no question about that in the record. As to the Lockheed transaction, Your Honor, it is also very clear in the record—there's an excerpt of a deposition from a Lockheed official— that from the time they entered into the outsourcing arrangement, Lockheed wanted to buy the computers from Gateway. Lockheed said, that's the way we do this as an outsourcer. And actually, from Mr. Whiteson's perspective, from his previous experience at AT&T, he knew that that's the way an outsourcer generally does it. It likes to own the equipment. And since you have so little time— Pardon? It wasn't all Gateway equipment. No, it didn't. No, it wasn't, Your Honor. But first of all, it doesn't undermine the general principle that the outsourcer, for perfectly legitimate reasons, wants to own it. But the other thing that I think is important—and this gets to Mr. Whiteson's knowledge, and he stood in a very different position in terms of the operational details. There's nothing in the record that reflects that Mr. Whiteson knew what the mix of equipment was. In fact, to the contrary, the evidence in the record is that Mr. Whiteson knew there were Gateway PCs in there. He didn't know anything about the composition of it. But the very point that you're making, and very effectively, is that there are material issues of fact here. People disagree about these things. You advocate one way. Counsel for the SEC advocates another thing. But you've got a judge here who's made a decision between the two versions. And the question I have is, why aren't these material issues of fact that should be tried by a jury? Well— Or a finder of fact in a trial. Okay. So a couple of issues. A couple of responses to that, Your Honor. First of all, there is no genuine issue of material fact. I submit that—and this is all laid out in the briefs. Right. You look at the record sites that the SEC points to. I don't think they support the proposition that the SEC says. Frankly, I think they're distortions of the record. And I don't think there's a genuine issue of material fact in addition to that, Your Honor. There are independently sufficient reasons. For example, on the 10b-5 count, there is no scienter for Mr. Weitz in here. I just do not see how there is a genuine issue of material fact. The evidence of his good faith is abundant and undisputed. I have no doubt that if you were the trier of fact that you would so find. Well, you're— No, but, Your Honor, I think that the district court correctly determined that with regard to these events that took place now more than 10 years ago, no reasonable finder of fact could reach that conclusion. And although scienter, you know, often is fact-specific, in this Court's on-box decision in Hollinger, for example, the Court said at summary judgment, when there is no genuine issue of material fact about a scienter, it should not go through the jury. We'll look at it. We'll examine the record. Thank you, Your Honor. Mr. Deschamps. Thank you. We've permitted them some extra time, so we'll give you a few minutes. Thank you, Your Honor. I have four quick points. I think I can do them in 90 seconds. First, Manza, it's not true that if there's no gap violation, there's no financial fraud. We cite the Evers case on page 55 of our brief. Obviously, we think there is a gap violation. As for Todd, Todd said that the Lockheed transaction was basically disclosed and approved by PWC. Well, PWC testified. We presented evidence. The PWC auditors testified. We didn't know about Lockheed until later. So there's substantial evidence there. Three, on the cross appeal, it's true. What happened was the district court denied the motions for new trial without prejudice instead of conditionally ruling. I would urge this court that if it reverses JMOL, that it could hold that the verdicts are not against the great weight of the evidence and that the new trial should have been denied. Now, we don't have a separate argument. It's the evidence that we lay out in our brief, that substantial evidence, I would say, also shows verdicts are not against the great weight. But if we reverse summary judgment as to Wysen, you're going to have to go to trial on him, are you not? Well, we have not argued that we are entitled to summary judgment against Wysen, although, as I mentioned, I think the control person status, I think there's no issue on that. If we conclude there was error as a matter of law on the district court's understanding of control person liability, that's one thing. If we conclude that, plus there's a material issue of fact with regard to CNTR that only a fact finder can resolve, I don't see how you can avoid having to go to trial on Wysen. Well, again, we haven't argued in our brief that we can avoid a trial. But it would be a very different trial than what we've had. It would be a trial under the correct legal standards. Finally, on Wysen, on the fraud charges, we are not conceding that the AOL and Lockheed accounting was not improper. We have not appealed fraud charges that require CNTR. There's two aspects to the fraud. There's that the AOL and Lockheed is misleading and that Wysen acted with banter. We chose to narrow the scope of this and not to challenge the accounting fraud. But we are definitely not conceding that the accounting is okay. Okay. Are there any further questions? Thank you. The court appreciates the arguments presented. The case argued is submitted for decision.
judges: Schroeder, Tallman, Smith M.